06-0520-cr
United States v. Rommy

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: November 28, 2006        Decided: November 5, 2007)

Docket No. 06-0520-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

HENK ROMMY,

*Defendant-Appellant.*

_____

Before:

       JACOBS, *Chief Judge*, WALKER, and RAGGI, *Circuit Judges.*

_____

Appeal from a judgment of conviction entered in the United States District Court for

the Southern District of New York on a single count of conspiracy to import "ecstasy" into

the United States in violation of 21 U.S.C. §§ 952(a), 963. Rommy contends that the district

court erred (1) in instructing the jury that venue in the Southern District of New York could

be established by a telephone call placed by an undercover agent in that district to Rommy

in the Netherlands; and (2) in admitting evidence obtained in violation of the mutual legal

assistance treaty in effect between the United States and the Netherlands, as well as various provisions of the Constitution and the Federal Rules of Evidence.

AFFIRMED.

---

RICHARD D. WILLSTATTER, Green & Willstatter, White Plains, New York, *for Defendant-Appellant.*

KEVIN R. PUVALOWSKI, Assistant United States Attorney (Scott L. Marrah, Assistant United States Attorney, *on the brief*), *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, *for Appellee.*

---

REENA RAGGI, *Circuit Judge*:

Defendant Henk Rommy appeals from a judgment of conviction entered on January 27, 2006, in the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*), following a jury trial at which he was found guilty on one count of conspiracy to import methylenedioxymethamphetamine, commonly known as "MDMA" or "ecstasy," into the United States in violation of 21 U.S.C. §§ 952(a), 963. Presently incarcerated serving a twenty-year sentence, Rommy challenges his conviction on the grounds that the district court erred (1) in charging the jury that venue in the Southern District of New York could be established by a telephone call placed by an undercover agent in that district to Rommy in the Netherlands; and (2) in admitting evidence obtained in violation of the mutual legal assistance treaty in effect between the United States and the

Netherlands, as well as various provisions of the Constitution and the Federal Rules of Evidence. Because we conclude that the alleged errors are either without merit or, in any event, harmless, we affirm the judgment of conviction.

## I.   **Factual Background**

From at least 1980, Dutch national Henk Rommy, also known as the "Cobra," headed an international drug ring that trafficked in large quantities of controlled substances. The trial evidence establishing Rommy's guilt included the testimony of co-conspirators, recorded conversations between Rommy and both a government informant and an undercover agent of the Drug Enforcement Administration ("DEA"), and statements volunteered by Rommy to federal agents with whom he asked to speak while incarcerated in Spain pending extradition to the United States.

### A.   Co-conspirator Testimony

#### 1.   Background Evidence as to Rommy's European Drug Trafficking

Thomas Bosch, a Swiss banker turned drug trafficker, testified that, in the late 1980s and continuing for more than a decade thereafter, he and confederate Jack Zuchetto smuggled hundreds of kilograms of hashish from Rommy in the Netherlands to buyers in Switzerland.[1] In or about 2000, Bosch learned from Zuchetto that Rommy was experiencing problems

---

[1] Although Bosch's testimony about dealing drugs with Rommy in Europe was quite detailed, we here provide only a brief summary as background to the events supporting the charged conspiracy.

3

smuggling ecstasy pills into Switzerland and that he sought their assistance in transporting a 100,000 pill shipment from the Netherlands to Zurich. Bosch testified that the pills in question were light blue in color and stamped with the logo of the late Italian fashion designer Gianni Versace. After successfully completing this delivery, Bosch helped smuggle two more shipments of ecstasy pills into Switzerland for Rommy.

2. <u>Rommy Recruits Bosch to Smuggle Ecstasy into the United States</u>

In 2000, Rommy also asked Bosch to smuggle one million ecstasy pills into the United States. Bosch explained that he had acquired some familiarity with transporting drugs into this country because, in the three preceding years, he and his fiancée, Daniela Rinaldi, had smuggled approximately 120 kilograms of hashish and marijuana into the United States, concealing the drugs in recreational vehicles shipped from Europe. Rommy told Bosch that he wanted the ecstasy imported into New York. When Bosch expressed a preference for Miami as the port of entry, Rommy agreed, advising Bosch that his New York contacts could travel to Miami to pick up the shipment. Eventually, Bosch and Rommy decided that half the pill shipment would be given to Rommy's New York confederates while Bosch would transport the remainder into Mexico for sale in that country. Bosch would convert the proceeds from the ecstasy shipment into cocaine for delivery to Rommy in Europe. In return, Rommy would pay Bosch one dollar per pill successfully smuggled, for an anticipated total of $1 million.

When, in late 2000, it came time to execute the million-pill shipment, Bosch could not locate Rommy. In fact, Rommy had been arrested by Dutch authorities in connection with an unrelated investigation into his drug activities. He remained incarcerated from November 2000 until May 2001.

### 3. Rommy's Involvement in the Allen/Bosch/Rinaldi Shipment

In 2000, Bosch and Rinaldi successfully smuggled a load of ecstasy into the United States for a different Dutch trafficker named Redouan. Redouan arranged for the drugs to be sold in Miami by Thomas Allen. Upon the successful completion of this scheme, Bosch, Rinaldi, and Allen decided to team up to import another ecstasy shipment totaling 800,000 pills into the United States in 2001. As Bosch and Rinaldi each testified, Allen agreed to procure the pills in the Netherlands and to be financially responsible for half the shipment; Bosch and Rinaldi agreed to transport the pills into the United States and to be financially responsible for the remaining half.

After the 800,000 ecstasy pills were successfully smuggled into Miami, Allen told Rinaldi that Allen's half of the shipment had to be sold first because it belonged to the "Cobra" (i.e., Rommy), who wanted his money right away. In fact, Allen did sell his half of the shipment; meanwhile Bosch and Rinaldi were arrested by Florida authorities in possession of the remaining 400,000 pills.

5

B.    The DEA Undercover Investigation

1.    Dutch Authorities Alert DEA Agents to Rommy's Interest in Smuggling Ecstasy into the United States

In early 2000, at the same time that Rommy was plotting with Bosch, Rinaldi, and Allen to smuggle ecstasy pills into the United States, Dutch authorities contacted DEA agents stationed in the Netherlands to advise them that a confidential informant, Alexander Van der Laan DeVries ("DeVries"), had been approached by Rommy to transport ecstasy to New York City.[2]  After debriefing DeVries, the DEA decided to use him to introduce Rommy to an undercover agent, Mark Grey, whose purported criminal connections at New York ports would allow him to smuggle ecstasy into New York cached in vintage cars.

2.    The Treaty Requests for Dutch Assistance

To facilitate this plan, in April 2000, pursuant to a mutual legal assistance treaty then in effect between the United States and the Netherlands, see Treaty on Mutual Assistance in Criminal Matters, June 12, 1981, U.S.-Neth., 35 U.S.T. 1361, T.I.A.S. No. 10,734 ("MLAT"), the United States formally requested Dutch authorization to employ various investigative techniques in the Netherlands.  Specifically, the United States sought to use DeVries in an undercover capacity and, pursuant thereto, to make audio or video recordings in the Netherlands of conversations between the confidential informant and Rommy.

---

[2] Because DeVries did not testify at trial, the jury heard no specific evidence about this initial recruitment.

6

Authorization was also requested for United States officials to wiretap Rommy's telephone in the Netherlands. Dutch authorities denied the April 2000 request.

A second MLAT request from the United States, in September 2002, sought access to evidence and witnesses developed by Dutch authorities in the course of their investigations into Rommy's criminal activities. In granting this request, the Netherlands provided the United States with a transcript of an October 30, 2000 telephone call intercepted by the Dutch police in which Rommy and an unnamed confederate discussed the limited supplies of "Versace t-shirts." At trial, the government would use Bosch's testimony about ecstasy pills stamped with the Versace logo to argue that this conversation related to drugs. See infra at **[59-60]**.

### 3. The Recorded Telephone Calls

Despite the denial of the initial MLAT request, United States authorities proceeded with their plan to use DeVries in an undercover investigation of Rommy, but they conducted no electronic monitoring in the Netherlands. Instead, between October 2001 and March 2003, DEA agents working in Manhattan recorded five telephone calls in which Rommy, DeVries, and Agent Grey engaged in thinly veiled discussions about smuggling ecstasy into New York. Because the location of the parties and the initiator of the calls are issues relevant to the venue argument on appeal, we duly note these facts.

It is undisputed that the first recorded call was placed by DeVries in Manhattan to

7

Rommy in the Netherlands on October 20, 2001. In that conversation, DeVries not only told Rommy that he was in New York City, he specifically reported that he was standing near the site of the recently destroyed World Trade Center. With respect to the smuggling plan, Rommy asked DeVries if his "friend" (Agent Grey) was going "to look at the car." Telephone Tr. Oct. 20, 2001, at 1. When DeVries replied that this had already been done, Rommy inquired, "Do you think he can sell it, do you think?" Id. DeVries assured Rommy of his friend's ability to do what was necessary, and advised that he (DeVries) would be back in the Netherlands the following week.

It would be almost a year before the next recorded call on September 17, 2002. On that date, DeVries was again in Manhattan meeting with federal agents at the United States Attorney's Office. According to the agent who recorded this call, Rommy, who was then in the Netherlands, placed the call to the informant's cell phone. At trial, Rommy's counsel disputed his client's initiation of the call, an argument made possible by the fact that the recording of the start of the call was inaudible. In the ensuing conversation, DeVries reported that he was "going to come to Spain with Mark [i.e., Agent Grey]." Telephone Tr. Sept. 17, 2002, at 2. Rommy stated that he would meet the men there. The Spain meeting, scheduled for October 4, 2002, never took place because, from October 2-4, Rommy was once again detained by Dutch authorities conducting an unrelated investigation.

A third recorded telephone call occurred on October 17, 2002. Agent Grey testified

8

that, on that date, while in his Manhattan office, he received an unexpected call on an undercover telephone from Rommy and DeVries who were then together in the Netherlands. Because it took Grey a few moments to attach a recording device to the telephone, the initial part of the conversation was not recorded. Grey testified, however, that the first voice he heard on the line was Rommy's, who introduced himself as "Alex's friend" and who apologized for missing the meeting in Spain. Trial Tr. 61. The defense challenged this account, arguing that DeVries placed the call because his was the first voice recorded speaking with Grey. The government disputed this contention, noting that, within moments, Grey asked DeVries to "put him [i.e., Rommy] back on." Telephone Tr. Oct. 17, 2002, at 2 (emphasis added). In the course of this conversation, Rommy stated that he was "famous in Holland," to which Grey replied that he was not interested in fame, just in "do[ing] some business together." Id. at 3. Rommy told Grey, "don't worry. I see you soon." Id.

It was undisputed that the fourth and fifth recorded calls were placed by Agent Grey in Manhattan to Rommy in the Netherlands. In the fourth call, on February 25, 2003, for which DeVries was present with Rommy, the three men planned a meeting. In agreeing to the proposed schedule, Rommy stated, "Ok, no problem. I can do a lot of things." Telephone Tr. Feb. 25, 2003, at 3. In the final recorded telephone conversation on March 14, 2003, Rommy was initially distracted, explaining, "I have a lot of problems. Somebody

9

must pay me some money, about, ah, $240,000." Telephone Tr. Mar. 14, 2003, at 2. Soon thereafter, however, Rommy confirmed that he would meet with Grey the following week.

### 4. The Videotaped Meeting in Bermuda

On March 23, 2003, Rommy met with Agent Grey and DeVries at a hotel in Bermuda to finalize a deal to import 300,000 ecstasy pills into New York City. In a videotaped meeting lasting more than an hour, Rommy provided the most compelling evidence of his own guilt. Speaking openly of his experience in narcotics trafficking generally and ecstasy trafficking in particular, Rommy explained that ecstasy pills were made from special oils produced in China. According to Rommy, two liters of the oil could yield 8,000 ecstasy pills for a total cost of $2,500; those 8,000 pills, in turn, could command $150,000 on the open market. Rommy stated that he had "friends" who could get 2,000-3,000 liters of the oil per year, Videotape Tr. Mar. 23, 2003, at 48, and he bragged of his connections with Dutch drug laboratories that "make the best stuff," id. at 50.

Agent Grey represented to Rommy that his contacts at the ports in New York would allow him to get drug-laden cars through customs without inspection. Grey nevertheless told Rommy that, once he got the ecstasy pills into the United States, he did not want to be responsible for their disposal. Rommy assured Grey that he already had people in New York City ready to accept the ecstasy shipment, and that these individuals would pay Grey in "cash right away" upon delivery. Id. at 37. When Grey indicated a preference to be paid in pills,

10

Rommy agreed to give Grey one-third of the shipment — 100,000 out of a total of 300,000 pills — as a transportation fee.

C.    Rommy's Prison Interview in Spain

Following the Bermuda meeting, United States authorities made an international request for Rommy's provisional arrest. On November 12, 2003, Spanish authorities, acting on this request, took Rommy into custody and detained him in a Madrid prison. While extradition proceedings were pending, Rommy, through his girlfriend Laura de Vreeze, requested a meeting with DEA representatives in Spain. At the time, Rommy had been represented for more than eight months in the extradition proceedings by two Spanish attorneys.

In response, DEA Special Agent John Fernandez, accompanied by a DEA intelligence analyst, an inspector from the Spanish police, and Ms. de Vreeze, met with Rommy in the Madrid prison on August 26, 2004.[3] At no time during this meeting was Rommy advised that he had rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), or asked for an explicit waiver of those rights. Instead, after introducing himself, Agent Fernandez asked Rommy why he had requested a meeting. Rommy replied that he was facing extradition to the United

---

[3] At the time of this meeting, Agent Fernandez had been working as a DEA country attaché in Spain for less than a month, having previously been assigned to the agency's Los Angeles field office. Although Rommy was detained on the request of the United States, Fernandez asserted that, at the time of the Madrid prison meeting, he knew nothing about any DEA undercover investigation into Rommy's drug activities.

11

States where he knew that penalties for drug trafficking were more severe than in Europe. He had sought a meeting to proffer his cooperation to the DEA "in setting up other traffickers that he knew, in exchange for leniency at sentencing." Trial Tr. 556. Agent Fernandez told Rommy that he could not promise any leniency because Rommy's immediate fate lay in the hands of Spanish authorities and, even if he were extradited to the United States for prosecution, leniency "was ultimately the decision of a judge." Id. Agent Fernandez then offered to end the meeting, but Rommy stated that he still wished to go forward and provide information.

Rommy proceeded to speak at some length and in detail about areas of potential cooperation. He described himself as a well-known international drug broker whose nickname was the "Cobra." To confirm his notoriety, Rommy showed Agent Fernandez press clippings from Dutch newspapers that included his photo and reported on his criminal exploits. Rommy emphasized his ability to target very high-level traffickers and proceeded to disclose names and background information on more than a dozen such persons, including Bosch, Zuchetto, Allen, and DeVries. Rommy expressed confusion as to his own arrest, insisting that he had never sent ecstasy to the United States despite being pushed to do so by others, notably, DeVries. Rommy stated that DeVries had recently arranged a meeting in Bermuda where Rommy had spoken with a smuggler who could clear drugs into New York's ports. Unfamiliar with any of the persons or facts disclosed by Rommy — not even with the

12

fact that the "smuggler" whom Rommy met in Bermuda was an undercover DEA agent —
Fernandez simply took notes as Rommy spoke, interrupting the defendant only to ask follow-
up questions that sought the spelling of names, the dates when recounted events occurred,
and, on one occasion, a clarification as to a substance that Rommy referred to as "BMK,"
apparently an ingredient of ecstasy.

Several weeks later, Agent Fernandez and Rommy's lawyers discussed a possible
second meeting. Fernandez reported that Rommy's lawyers were enthusiastic about such a
meeting and expressed disappointment when it did not materialize.

### D.    Rommy's United States Prosecution

#### 1.    Indictment

Rommy was originally indicted by a grand jury in the Southern District of New York
in July 2002, well before his provisional arrest in Spain. That initial indictment charged
Rommy with one count of conspiracy to import ecstasy into the United States in violation of
21 U.S.C. §§ 952(a), 963. Two superseding indictments were filed in November and
December 2003, expanding the time frame of the charged conspiracy and adding a forfeiture
allegation.

#### 2.    Suppression Motions

After extradition to the United States and before trial, Rommy moved to suppress
various evidence, including (1) the recorded telephone calls and the videotape of the

Bermuda meeting, which he challenged as the fruits of an unlawful DEA undercover operation conducted in violation of the MLAT; and (2) the statements he made to the DEA while incarcerated in Spain pending extradition, which he claimed were procured in violation of the Fifth and Sixth Amendments. The district court denied these motions as without merit.

### 3. The Challenged Venue Charge

Rommy's trial commenced on September 20, 2005. The government introduced the extensive incriminating evidence already detailed. As was his right, Rommy offered no evidence. He did, however, move for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure based on the government's alleged failure to establish venue in the Southern District of New York. The district court denied the motion but pursued the venue question further with counsel at the charging conference.

Specifically, the district court rejected defendant's request to instruct the jury that venue in the Southern District of New York had to be proved beyond a reasonable doubt, charging instead that the government could carry its venue burden by a preponderance of the evidence. The district court further proposed to charge the jury — by way of example — that a telephone call made in furtherance of the conspiracy by a defendant outside the Southern District to a non-conspirator within the district could establish venue in the district. While acknowledging the existence of some cases indicating that even calls "going the other way," i.e., from a non-conspirator in the district to a defendant outside the district, might suffice,

14

Trial Tr. 632, the court reserved judgment on that possibility: "I think I want to think a little bit more about this issue of the [outgoing] phone call," id. at 634. In the end, the issue was left unresolved, and the court charged the jury as follows with respect to venue:

> Finally, you must determine whether any action in furtherance of the alleged conspiracy occurred at least in part in the Southern District of New York. This is called "venue," and, unlike all the other requirements, which must be proven beyond a reasonable doubt, the government is only required to prove venue by a preponderance of the evidence; that is, that it is more probable than not. [Court defines Southern District] It is not necessary that the government prove that all or even most of the conspiracy was carried out in the Southern District of New York. Rather, it is sufficient if you find by a preponderance of the evidence that any act in furtherance of the conspiracy occurred at least in part in the Southern District of New York. For example, if you find by a preponderance of the evidence that after the alleged conspiracy was formed, a telephone call in furtherance of the conspiracy was made to a location in the [district], that would be sufficient to fulfill the venue requirement, even if the call was made to an undercover agent or some other nonconspirator.

Id. at 748-49.

In the course of its deliberations, however, the jury itself raised the outgoing call issue, asking, "[C]an venue be proved by an outgoing call; in other words, if [S]pecial [A]gent Grey made a call out to Henk Rommy on October 17, does that constitute venue[?]" Id. at 773. Disclosing the inquiry to counsel, the district court observed, "So the issue that we have ducked has come back and can no longer be ducked." Id. Rommy's counsel demurred, insisting that the outgoing call issue had already been decided in Rommy's favor, that counsel had relied on that decision in summation, and that any response allowing the jury to base venue on an outgoing call would violate Federal Rule of Criminal Procedure 30(b),

15

which requires the trial court to inform parties before summations of its rulings on requested instructions. The district court disagreed. It observed that it had given the jury "an example" of an incoming call supporting venue, but this was "not a definitive ruling excluding all other possibilities." Id. at 774. It concluded that venue could be established by an outgoing call from Agent Grey within the district to Rommy outside the district "if [the call] meets the other requirements for an act in furtherance of a conspiracy." Id. at 778. The court rejected defense counsel's argument that Rommy would "have to know that Agent Grey was in New York at the time" of the outgoing call for such a call to establish venue. Id. The court also denied Rommy's request to charge the jury further on the issue of manufactured venue,[4] finding that the issue was "totally before [the jury]," and that the requested instruction was not responsive to the jury's particular inquiry. Id. at 780.

Following this colloquy, the district court responded to the jury's venue inquiry as follows:

> The first question is, can venue be proved by an outgoing call. The answer to that is yes, a call that originates in the Southern District of New York can go somewhere else if it meets the other requirements to support venue just like an incoming call. In the instructions I used an example of an incoming call, but an outgoing call that meets the requirements would also support venue in the Southern District of New York.

---

[4] Defense counsel requested that the district court "add some language" that "if the defendant was manipulated in calling this district" to "manufacture" venue, venue would be improper in the district. Trial Tr. 781.

16

The second question is, "In other words, if [S]pecial [A]gent Grey made a call out to Henk Rommy (10/17) does that constitute venue." The answer to that is it could. Remember, you have to find before you can find that any such call in either direction supports venue that, first, there was already a conspiracy formed and, second, that the call in some manner furthered the conspiracy.

Now, a third party can initiate a call, it doesn't have to be a co-conspirator, obviously, [S]pecial [A]gent Grey was not a co-conspirator; on the other hand, a call that is initiated by someone who is not a co-conspirator would not count unless it was a call that in some fashion was either induced by the ongoing conspiracy or in some way furthered the ongoing conspiracy.

Id. at 782-83.

On September 30, 2005, the jury returned a guilty verdict.

### 4. Sentencing

At sentencing, the district court found that Rommy had conspired to import at least 1.7 million ecstasy pills into the United States. This quantity included the aborted one-million pill agreement with Bosch and Rinaldi; the 400,000 pills that Rommy gave Thomas Allen as part of the 800,000 pill Allen/Bosch/Rinaldi shipment in 2001; and the 300,000 pills discussed with Grey and DeVries in Bermuda. With an offense level of 40 and a criminal history of V, Rommy's Sentencing Guidelines range provided for a prison term of 360 months to life. This range was, however, limited by the statutory maximum term of twenty years' incarceration. See 21 U.S.C. §§ 960(b)(3), 963.

Rejecting defense arguments for leniency, the district court sentenced Rommy to the maximum twenty-year prison term, observing that he was "a hardened, sophisticated, career

17

criminal" who had organized "international drug deals whose scope and sophistication is outweighed only by their intrinsic value." Sentencing Tr. Jan. 17, 2006, at 21. In addition to twenty years' incarceration, the court sentenced Rommy to three years' supervised release, a $100 special assessment, and a forfeiture judgment in the amount of $1 million.

Rommy timely appealed the judgment of conviction.

## II.    **Discussion**

### A.    Challenge to Venue Instructions

Rommy asserts that the district court's jury instructions as to venue were flawed in two respects: (1) in identifying the government's venue burden as a preponderance of the evidence rather than proof beyond a reasonable doubt, and (2) in allowing the jury to find venue in the Southern District of New York based on calls made by an undercover agent in Manhattan to defendant in the Netherlands. We review legal challenges to jury instructions de novo, and, even where we identify error, we will reverse a conviction "only if the charge, taken as a whole, was prejudicial." United States v. Gaines, 457 F.3d 238, 244 (2d Cir. 2006) (quoting United States v. Caban, 173 F.3d 89, 94 (2d Cir. 1999)); see United States v. Ford, 435 F.3d 204, 209-10 (2d Cir. 2006); see also United States v. Ramirez, 420 F.3d 134, 139 (2d Cir. 2005) (noting that questions of law pertaining to venue are reviewed de novo). In this case, we conclude that neither of defendant's challenges to the venue charge has merit.

18

### 1. The Preponderance Burden

Rommy's argument that venue must be proved beyond a reasonable doubt requires little discussion.

The government's burden to establish venue originates in two provisions of the Constitution. Article III, section 2, states, in relevant part, that criminal trials "shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment further guarantees that a criminal defendant "shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." Id. amend. VI. In furtherance of these provisions, Rule 18 of the Federal Rules of Criminal Procedure requires that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

As this court has frequently observed, the venue requirement, despite its constitutional pedigree, "is not an element of a crime" so as to require proof beyond a reasonable doubt; rather, venue need be proved only "by a preponderance of the evidence." United States v. Ramirez, 420 F.3d at 139 (emphasis added); United States v. Chen, 378 F.3d 151, 159 (2d Cir. 2004); United States v. Svoboda, 347 F.3d 471, 485 (2d Cir. 2003); United States v. Bala, 236 F.3d 87, 95 (2d Cir. 2000); United States v. Smith, 198 F.3d 377, 382 (2d Cir.

19

1999).[5] To the extent Rommy persists in arguing that venue is an element, his argument is convincingly refuted by the fact that the law treats objections to venue as waived "unless 'specifically articulated' in defense counsel's motion for acquittal." United States v. Potamitis, 739 F.2d 784, 791 (2d Cir. 1984) (quoting United States v. Grammatikos, 633 F.2d 1013, 1022 (2d Cir. 1980)); accord United States v. Bala, 236 F.3d at 95.

Accordingly, we reject Rommy's burden challenge to the district court's venue instruction as meritless.

### 2. Basing Venue on the Site of a Government Actor's Outgoing Call to a Conspirator

Whatever burden applies to venue, Rommy submits that the district court's response to the jury's venue inquiry was flawed in three respects: (a) the court erred as a matter of law in instructing that telephone calls from a government actor in Manhattan to Rommy in the Netherlands could establish venue in the Southern District of New York; and, even if such calls could support venue, the instruction (b) ran afoul of Fed. R. Crim. P. 30(b) because it contradicted representations made to counsel at the charging conference; and (c) should have included a charge on "manufactured venue." We are not persuaded.

---

[5] Because venue is not an element of a crime, a question might be raised as to whether venue disputes must, in fact, be submitted to a jury. See United States v. Jenkins, 510 F.2d 495, 498 & n.4 (2d Cir. 1975) (noting issue without deciding it); see also United States v. Hart-Williams, 967 F. Supp. 73, 76-78 (E.D.N.Y. 1997) (concluding that venue need not be decided by jury), aff'd on other grounds, 129 F.3d 115 (Table), 1997 WL 701374 (2d Cir. Nov. 10, 1997). Since the question was not briefed in this case, we do not attempt to resolve it here.

20

a.   Telephone Calls in Furtherance of a Conspiracy Can Establish
     Venue Either Where Placed or Received

(1)   The Venue for Conspiracy

The venue requirement serves to shield a federal defendant from "the unfairness and hardship" of prosecution "in a remote place." United States v. Cores, 356 U.S. 405, 407 (1958).  As the constitutional text makes plain, however, unfairness is generally not a concern when a defendant is tried in a district "wherein the crime shall have been committed."  U.S. Const. amend. VI.

The site of a crime's commission is not always readily determined.  The commission of some crimes can span several districts.  In such circumstances, Congress has instructed that venue properly lies in "any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a); see United States v. Ramirez, 420 F.3d at 139.  Applying this rule to the continuing crime of conspiracy, this court has held that venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme.  See United States v. Geibel, 369 F.3d 682, 696 (2d Cir. 2004); United States v. Smith, 198 F.3d at 382; United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2d Cir. 1987).  Thus, a defendant need not himself have ever been physically present in a district for a conspiracy charge against him to be venued there.  See United States v. Naranjo, 14 F.3d 145, 147 (2d Cir. 1994) (holding with respect

21

to venue that conspiracy defendant "need not have been present in the district as long as an overt act in furtherance of the conspiracy occurred there").[6]

### (2)     Telephone Calls as Overt Acts

### (a)     Calls Between Conspirators

It is beyond question that telephone calls can constitute overt acts in furtherance of a conspiracy.  See United States v. Smith, 198 F.3d at 382; United States v. Naranjo, 14 F.3d at 147; United States v. Friedman, 998 F.2d 53, 57 (2d Cir. 1993).  In cases involving telephone calls between co-conspirators in different districts, we have ruled that venue lies "in either district as long as the calls further the conspiracy."  United States v. Smith, 198 F.3d at 382.  In such circumstances, the direction of the call is irrelevant to venue.  Id. (noting that in United States v. Friedman, 998 F.2d at 57, where defendant in Long Island placed calls in furtherance of conspiracy to confederate in Manhattan, venue was established

---

[6] Mindful of these principles, Rommy does not contend that he could not be prosecuted anywhere in the United States.  Overt acts committed by co-conspirators Bosch, Rinaldi, and Allen in Miami would presumably have supported venue in the Southern District of Florida.  Even if Rommy could argue that the charged conspiracy was committed, if at all, "out of the jurisdiction of any particular State or district," he would not escape federal prosecution because venue would then exist in the district to which he was "first brought" into the United States to answer the indictment.  See 18 U.S.C. § 3238.

It appears that Rommy never moved for a change of venue to the Southern District of Florida or the district where he first entered the United States (if it was not the Southern District of New York), in all likelihood because such venues were no more convenient for this Dutch national than the Southern District of New York.  See Fed. R. Crim. P. 21(b) (providing for transfer of venue "for the convenience of the parties and witnesses and in the interest of justice").

22

in the Southern District of New York, and concluding "[t]here is no reason why the opposite calling pattern should not also establish venue"); accord United States v. Kim, 246 F.3d 186, 193 n.5 (2d Cir. 2001) (observing that phone call "to or from" a district can establish venue in that district as to any member of conspiracy).

Rommy submits that the reasoning in these cases cannot support venue in a district from which a non-conspirator initiates a call to a conspirator outside the district. To the extent the conspirator uses such a telephone call to further the conspiracy, we disagree.

> (b) Calls Between Conspirators and Non-Conspirators

> (i) Calls Placed by Conspirators

When one of the participants in a telephone call is a non-conspirator, such as a government actor, we have already ruled that a call in furtherance of the conspiracy placed by a conspirator outside the district to a government actor within the district is sufficient to establish venue in the district with regard to any member of the conspiracy "at least in the absence of unfairness or hardship . . . arising from trial in that district, or artificial creation of venue in that district by the Government." United States v. Naranjo, 14 F.3d at 146 (holding that telephone call from conspirator in Eastern District of New York to undercover agent in Southern District of New York established venue in Southern District as to defendant who was member of conspiracy); see also United States v. Stewart, 878 F.2d 256, 258 (8th Cir. 1989) (upholding venue in North Dakota when Colorado defendant placed call

23

to telephone in North Dakota that was programmed to forward calls to undercover agent in Minnesota). In light of this precedent, Rommy's own telephone calls from the Netherlands to government actors in Manhattan certainly support venue in the Southern District of New York.

(ii)     <u>Calls Placed by Government Actors</u>

a)     <u>The Conspirator's Use of Such a Call to Further the Conspiracy Renders It an Overt Act</u>

On this appeal, however, we must consider whether the district court erred in allowing the jury to base its venue finding on a different scenario: telephone calls <u>from</u> government actors within the district to Rommy in the Netherlands. Although this court has not previously considered whether such circumstances can establish venue in the district where the call was initiated, two of our sister circuits have answered that question in the affirmative.

In <u>United States v. Cordero</u>, 668 F.2d 32 (1st Cir. 1981), the First Circuit considered whether telephone calls from an undercover agent in the District of Puerto Rico to conspirators outside that district could establish venue in Puerto Rico to prosecute a conspiracy to import drugs into the island. In an opinion by then-Judge Breyer, the First Circuit ruled that such outgoing calls supported venue in Puerto Rico:

> Sorren and Cordero [the co-conspirators] spoke to Jimenez [the undercover agent] while he was in Puerto Rico and provided him with key information, which was then communicated to others. The fact that Jimenez placed the calls to Cordero and to Sorren who were outside the Commonwealth, does not

24

change the fact that Cordero and Sorren transmitted this information through Jimenez who was inside Puerto Rico. Moreover, they knew he was in Puerto Rico and they knew the offense was bound for completion in Puerto Rico. It is not as if Jimenez were a traveler making chance use of a telephone at a bus stop. Thus, we think it highly likely that the offense was "continued" in Puerto Rico.

Id. at 44 (citations omitted).

In Andrews v. United States, 817 F.2d 1277 (7th Cir. 1987), an Illinois defendant was prosecuted in the Western District of Wisconsin for unlawfully using a telephone to facilitate cocaine distribution in violation of 21 U.S.C. § 843(b). The trial evidence showed that, while in Illinois, the defendant had received at least one telephone call from an undercover agent in the Western District of Wisconsin who indicated interest in buying cocaine. The Seventh Circuit upheld venue in Wisconsin, observing that "section 843(b) proscribes a continuing offense and, as a result, the crime is committed both where the call originates and where it is received." Id. at 1279. The Seventh Circuit noted that "it appears clear from the record that [defendant] knew that at least one phone call was from [Wisconsin]," but it reserved decision on "whether venue would be proper in Wisconsin without the defendant's knowledge that the call originated from there." Id. at 1280 n.2. In response to defendant's complaint that, "allowing venue to be determined by the origin of the call, when the defendant does not make the call, could lead to forum-shopping on the part of the government," id. at 1279, the Seventh Circuit observed that there was no evidence of forum-shopping in the case before it. "To the extent that [forum-shopping] is a concern in a given

case, it is more appropriately handled at the trial level by a transfer to a more reasonable forum, pursuant to Fed. R. Crim. P. 21." Id. at 1279-80.

We agree with the First and Seventh Circuits that a telephone call placed by a government actor within a district to a conspirator outside the district can establish venue within the district provided the conspirator uses the call to further the conspiracy. Indeed, we conclude that the critical factor in conspiracy venue analysis is not whether it is a conspirator or a government actor who initiates the call; nor does it matter whether the conspirator is communicating with someone who is a knowing confederate, an undercover agent, or an unwitting third-party. What is determinative of venue — as the district court emphasized to the jury — is whether the conspirator used the telephone call to further the objectives of the conspiracy. See United States v. Naranjo, 14 F.3d at 147 ("We see no basis for imposing any more rigorous requirement concerning the content of the phone calls than that they do further the conspiracy.").

When a conspirator uses a telephone call — by whomever initiated — to further a criminal scheme, the conspirator effectively propels not only his voice but the scheme itself beyond his own physical location into that of the person with whom he is speaking. See United States v. Johnson, 323 U.S. 273, 275 (1944) (holding that venue may constitutionally lie in any area through which "force propelled by an offender operates"). In short, the conspirator avails himself of modern technology to commit at long distance the identical

26

overt act that he would commit by being in the same room with a person and whispering a conspiracy-furthering message directly into his listener's ear. In the latter circumstance, the conspirator's commission of an overt act does not depend on whether the listener rather than the conspirator initiates the conversation. Nor does it matter whether the listener is a confederate, an innocent third party, or an undercover agent. What matters is that the conspirator speaks, not to hear the sound of his own voice, but to communicate to his listener because he thinks that, by doing so, he furthers a conspiratorial goal. Thus, the overt act may properly be understood to have occurred at the site where the listener receives the conspirator's message. That an instrument of commerce or technology permits the conspirator to communicate with his listener while physically removed from him does not alter the fact that the conspirator has committed an overt act at the recipient's location. It means simply that his communication is a continuing act, supporting venue in the district of its initiation as well as the district of its receipt. As the Supreme Court recognized more than sixty years ago with respect to use of the mails, venue may constitutionally lie "in the district where [a defendant] sent the goods, or in the district of their arrival, or in any intervening district." Id.[7]

---

[7] In Johnson, the Supreme Court observed that various federal statutes sometimes place limitations on venue that might not be constitutionally required. See United States v. Johnson, 323 U.S. at 276-77 (comparing different statutes). No such statutory limits are at issue in this case.

27

Accordingly, even with respect to telephone calls placed by non-conspirators to conspirators, we adhere to our precedent that the direction of the call is irrelevant to venue. Calls "to or from" a district can constitute overt acts sufficient to establish venue, provided that the conspirator uses the call to further the objectives of the conspiracy. United States v. Kim, 246 F.3d at 193 n.5 (emphasis added); see also United States v. Smith, 198 F.3d at 382; United States v. Naranjo, 14 F.3d at 147; United States v. Friedman, 998 F.2d at 57.

b)      The Foreseeability of Venue

Rommy submits that, even if a call initiated by a government actor to a conspirator can support venue in the calling district, the district court erred in refusing to instruct the jury that the defendant had to know his caller's location. See United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985) (discussing fairness of venue in the "sense of having been freely chosen by [the defendant] as the place at which the [overt] acts were committed"); see also United States v. Ramirez, 420 F.3d at 143 (observing that "inquiry should not end with finding that venue properly lay" pursuant to statute; court should determine whether location of venue is constitutional).[8] Rommy notes that such knowledge was present in both Andrews

_____

[8] As Ramirez explained, the constitutional inquiry focuses on "whether a given venue is 'unfair or prejudicial' to the defendant" as compared to some other venue to which the charged crime bears substantial contacts. 420 F.3d at 143 (quoting United States v. Saavedra, 223 F.3d 85, 93 (2d Cir. 2000) (discussing four factors generally indicative of substantial contacts: "(1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding")). Because Rommy cannot show that being prosecuted in the Southern District of New York, as compared to some other United States venue (jurisdiction not being

28

and <u>Cordero</u>.  See <u>United States v. Andrews</u>, 817 F.2d at 1280 n.2 (noting fact without deciding whether it was essential to venue); <u>United States v. Cordero</u>, 668 F.2d at 44.

Preliminarily, we observe that the law does not require a defendant to have actual knowledge that an overt act will occur in a particular district to support venue at that location.  At most, it asks that the overt act's occurrence in the district of venue have been reasonably foreseeable to a conspirator.  See <u>United States v. Rowe</u>, 414 F.3d 271, 279 (2d Cir. 2005) (holding that, in prosecution for electronically advertising to distribute child pornography in violation of 18 U.S.C. § 2251(d), even though defendant posted advertisement from home in Kentucky, venue was proper in Southern District of New York because defendant "must have known or contemplated that the advertisement would be transmitted by computer to anyone the whole world over who logged onto the site" (internal quotation marks omitted));[9] <u>United States v. Svoboda</u>, 347 F.3d at 483 (collecting cases with respect to foreseeability of venue).  In this case, although the district court did not specifically instruct the jury as to the foreseeability of venue in the Southern District of New

_____

at issue in this case), "imposed an additional hardship on [him], prejudiced [him], or undermined the fairness of [his] trial," <u>United States v. Saavedra</u>, 223 F.3d at 94, no real constitutional venue concerns arise in this case.  Nevertheless, to the extent knowledge or, more accurately, foreseeability, of where an overt act will occur can mitigate fairness concerns as to venue, we proceed to discuss why Rommy's challenge necessarily fails.

[9] Unlike <u>Rowe</u>, this case does not present novel issues of foreseeability arising from the use of increasingly sophisticated communications technology.  Thus, we have no occasion to explore that subject beyond its discussion in <u>Rowe</u>.

29

York, the evidence supporting that conclusion is so compelling that, if there was an error in that omission, it was plainly harmless. See generally Neder v. United States, 527 U.S. 1, 10-16 (1999); California v. Roy, 519 U.S. 2, 5 (1996).[10]

The first recorded telephone call of the investigation, placed by DeVries to Rommy on October 20, 2001, establishes Rommy's knowledge that he was being called from the Southern District of New York. In reporting to Rommy that he had successfully made contact with someone who could help them smuggle drugs, DeVries stated, "I am with my friend [i.e., Agent Grey] in New York." Telephone Tr. Oct. 20, 2001, at 2. Indeed, DeVries effectively told Rommy that he was in Manhattan by noting that, as they spoke, he was looking at the site of the recently collapsed World Trade Center. From this conversation, Rommy would have to have foreseen the reasonable likelihood that future telephone calls from the smuggler contact (Agent Grey) would emanate from his base of operations in New York.[11] See generally United States v. Svoboda, 347 F.3d at 483 (holding that defendant, who was "savvy investor," could reasonably foresee that his stock trades would be executed

---

[10] Neder and Roy applied harmless error analysis to courts' failures to charge elements of crimes that the government was obliged to prove beyond a reasonable doubt. Accord Peck v. United States, 106 F.3d 450, 454-57 (2d Cir. 1997). It necessarily follows that harmless error analysis can be applied to a possible charging omission with respect to venue, which is not an element of the crime and requires only proof by a preponderance of the evidence.

[11] Because Rommy did not ask the district court to distinguish between the Southern and Eastern Districts of New York in charging the jury, we have no occasion to consider the fact that the city's boroughs span both venues.

on either NYSE or AMEX in Southern District of New York); United States v. Kim, 246 F.3d at 193 (holding that defendant who knew his victim paid invoices from a bank located in the Southern District of New York could reasonably foresee mailings in that district). Thus, if the district court had instructed the jury on Rommy's ability to foresee the location of the government agent's calls, we have no doubt that the jury would still have found venue.

Indeed, this conclusion is only reinforced by evidence that it was Rommy's specific conspiratorial purpose to smuggle ecstasy pills into New York. Rommy acknowledged both to his confederates Bosch and Rinaldi and to Agent Grey that fellow conspirators were already in New York ready to accept delivery of the smuggled pills and to pay for their transport. It was in this context that Rommy encouraged DeVries to find someone to facilitate the pill shipment through New York's ports. Once DeVries told Rommy that he had located such a "friend in New York," Telephone Tr. Oct. 20, 2001, at 2, Rommy "must have known or contemplated" that subsequent telephone calls from this smuggler would likely emanate from New York, United States v. Rowe, 414 F.3d at 279 (internal quotation marks omitted).

Like Cordero, then, this is not a case in which venue in the Southern District of New York is the product of some "chance use of a telephone" by a government agent. United States v. Cordero, 668 F.2d at 44. Rather, the calls here at issue were placed from or to the Southern District of New York because Rommy himself had identified New York as the

desired destination point of his smuggling scheme and was aware that individuals who could further the scheme were located in New York.  See id. (citing defendants' knowledge that undercover agent was in District of Puerto Rico and that drug smuggling scheme "was bound for completion in Puerto Rico" in concluding that call from agent to defendants "continued" crime in that district).

Accordingly, we conclude that the district court correctly charged the jury that a call placed by a government actor in Manhattan to Rommy in Amsterdam could establish venue in the Southern District of New York provided Rommy used the call to further the objectives of the charged conspiracy.

b.      The Challenged Charge Did Not Violate Fed. R. Crim. P. 30

Rommy contends that the challenged jury charge nevertheless violated Rule 30 of the Federal Rules of Criminal Procedure because it was at odds with agreements reached at the charging conference about how the jury would be instructed as to venue.  We disagree.

Rule 30 both permits parties to "request in writing" specific jury instructions, see Fed. R. Crim. P. 30(a), and requires the trial court to rule on those requests "before closing arguments," id. 30(b).  The rule is grounded in "basic concepts of fairness," allowing "counsel to conform their arguments to the law as it will thereafter be presented by the judge to the jury."  United States v. James, 239 F.3d 120, 124 (2d Cir. 2000) (internal quotation marks omitted).  The rule can thus be violated by a trial judge "giving instructions that he did

32

not inform counsel he would give, or by not giving instructions that he informed counsel he would." Id. Reversal on the basis of a Rule 30 violation is warranted, however, only "where the defendant can show that he was substantially misled in formulating his [closing] arguments or otherwise prejudiced." Id. (internal quotation marks omitted); accord United States v. Prawl, 168 F.3d 622, 629 (2d Cir. 1999); United States v. Adeniji, 31 F.3d 58, 64 (2d Cir. 1994). That is not this case.

The question whether venue could be based on a call from a government actor in the Southern District of New York to Rommy in the Netherlands was first raised in connection with defendant's Rule 29 motion for acquittal. The district court concluded, "I don't have to reach that [question]" because there is evidence of "a call initiated by the defendant" to the Southern District of New York. Trial Tr. 613. When the issue resurfaced at the charging conference, the record shows that the district court made no ruling: "I think I want to think a little bit more about this issue of the [outgoing] phone call." Id. at 634. Ultimately, it opted to finesse the point, offering the jury an illustrative example of venue that did not address the possibility of outgoing calls establishing venue:

> For example, if you find by a preponderance of the evidence that after the alleged conspiracy was formed, a telephone call in furtherance of the conspiracy was made to a location in the Southern District of New York, that would be sufficient to fulfill the venue requirement, even if the call was made to an undercover agent or some other nonconspirator.

Id. at 748-49 (emphasis added).

33

Neither the prosecution nor the defense requested the district court to decide the outgoing call issue before summation. Rather, the parties, no less than the district court, apparently took a chance that the jury might decide the case without any need to resolve the outgoing-call question. The gamble did not pay off. The jury's direct inquiry about outgoing calls, posed in the midst of deliberations, required the district court to address the question left unanswered at the charging conference: whether the outgoing-call evidence could support venue.

In these circumstances, we identify no Rule 30 violation. As our case law makes plain, when a defendant is on notice that the propriety of a particular jury instruction is subject to further consideration by the court, he cannot claim to have been substantially misled in framing his summation. See United States v. Eisen, 974 F.2d 246, 256-57 (2d Cir. 1992) (holding that where defendant "was on notice that his requested charge was the subject of further consideration," he "could not have been substantially misled by the Court in formulating his summation argument" (internal quotation marks omitted)). Indeed, although Rommy contends that the challenged instruction was prejudicial because it "cut the legs out from beneath" his manufactured venue argument, Appellant's Br. 35, the instruction did no such thing. Assuming the viability of a manufactured venue defense — which is debatable, see infra at **[35-38]** — that doctrine functions only as a basis for rejecting venue in cases in which the factual predicates for venue are established. Cf. United States v. Myers, 692 F.2d

34

823, 847 n.21 (2d Cir. 1982) (challenging venue, despite overt acts in Eastern District of New York, based on purported government overreaching in steering those acts into district). By instructing the jury that outgoing calls from, as well as incoming calls to, a government agent in the Southern District of New York could constitute factual predicates for venue in that district, the district court in no way undermined Rommy's argument that, whatever predicates might support venue in the Southern District of New York, those predicates had been unfairly manufactured by the government to prosecute Rommy in a district that had no actual connection to the charged crime.

c. The District Court Did Not Err in Failing to Charge "Manufactured Venue" in Response to the Jury Inquiry

Rommy asserts that the district court committed reversible error in failing to include a "manufactured venue" charge in its response to the jury inquiry about outgoing calls. Specifically, Rommy faults the court for not instructing the jury that, if Agent Grey placed telephone calls to Rommy for the purpose of "manufacturing venue" in the Southern District of New York, venue in that district could not be sustained.

Rommy's argument fails for several reasons. First, the district court acted well within its discretion in concluding that the requested instruction was not strictly responsive to the jury's inquiry as to whether outgoing calls generally, and Agent Grey's October 17 call in particular, could support venue.[12] While an accused is entitled to have the trial court include

_____

[12] The district court's response is quoted in its entirety supra at **[16-17]**.

35

in its initial instructions to the jury "any defense theory for which there is a foundation in the evidence," United States v. Allen, 127 F.3d 260, 265 (2d Cir. 1997) (internal quotation marks omitted), a trial court responding to a note from a deliberating jury is only required to answer the particular inquiries posed. The trial court enjoys considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry. See United States v. Young, 140 F.3d 453, 456 (2d Cir. 1998) (noting that response to jury request "is a matter committed to the sound exercise of a trial court's discretion"). In doing so, it is not required to reference specific arguments advanced or defenses raised by counsel in urging particular outcomes; cf. Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003) ("Because the jury may not enlist the court as its partner in the factfinding process, the trial judge must proceed circumspectly in responding to inquiries from the jury."). That conclusion applies with particular force in this case because Rommy argued manufactured venue to the jury without requesting any such instruction from the court in the initial charge. In these circumstances, he can hardly claim reversible error in the district court's refusal to charge the concept in response to a jury note that did not inquire on that subject.

Further, this court has never specifically ruled that a defendant is entitled to a manufactured venue charge. The concept derives from a footnote in United States v. Myers, in which this court did no more than leave open the possibility of invalidating venue in circumstances where the "key events occur in one district, but the prosecution, preferring trial

36

elsewhere, lures a defendant to a distant district for some minor event simply to establish venue." 692 F.2d at 847 n.21 (citing United States v. Archer, 486 F.2d 670, 682 (2d Cir. 1973) (holding that government agents cannot manufacture federal jurisdiction)); see United States v. Naranjo, 14 F.3d at 147 (rejecting defendant's claim that government "artificially created venue" in district). Myers itself presented no such venue concern because the "key events" of the crime had, in fact, occurred in the district of prosecution. United States v. Myers, 692 F.2d at 847 n.21. Thus, we had no occasion conclusively to decide the availability of such a defense, much less the propriety of submitting it to a jury.

In the quarter century since Myers, this court has never vacated a conviction on the basis of manufactured venue. Several of our sister circuits, moreover, have specifically rejected or at least questioned the doctrine. See United States v. Rodriguez-Rodriguez, 453 F.3d 458, 462 (7th Cir. 2006) (rejecting both manufactured venue and manufactured jurisdiction); United States v. Al-Talib, 55 F.3d 923, 929 (4th Cir. 1995) ("There is no such thing as manufactured venue or venue entrapment." (internal quotation marks omitted)); see also United States v. Spriggs, 102 F.3d 1245, 1250 (D.C. Cir. 1996) (expressing reservations as to "manufactured venue"); Andrews v. United States, 817 F.2d at 1279-80 [7th Cir.] (observing that appropriate way to address prosecution venue shopping is through transfer pursuant to Fed. R. Crim. P. 21). However convincing their reasoning, we need not here conclusively decide the continued vitality of the manufactured venue doctrine because the

37

record evidence clearly does not support its application to this case. See United States v. Stewart, 433 F.3d 273, 310 (2d Cir. 2006) (holding that refusal to give charge requested by defense does not warrant reversal unless "instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge" (internal quotation marks and citations omitted)).

Rommy was not "lure[d]" telephonically into the Southern District of New York to pursue a smuggling conspiracy otherwise focused elsewhere. United States v. Myers, 692 F.2d at 847 n.21. To the contrary, Rommy selected the district as the destination objective of the charged conspiracy. It was he who proposed smuggling ecstasy into New York, first to Bosch and then to DeVries and Agent Grey, telling them that he had confederates in place in New York ready to accept delivery of ecstasy pills. When Bosch expressed a preference to import the pills through Miami, Rommy stated that his New York associates would travel to Florida to arrange for the drugs' transportation to New York. Rommy reiterated his New York objective to Agent Grey both guardedly in the recorded telephone conversations and bluntly in the videotaped Bermuda meeting. Viewed in this context, Rommy's five recorded telephone conversations with government actors in New York cannot be viewed as "minor event[s]" engineered "simply to establish venue." Id. Rather, they were overt acts critical

38

to the furtherance of a criminal scheme that Rommy wished to realize in the Southern District of New York.

Accordingly, we identify no error in the district court's refusal to charge manufactured venue in response to the jury's venue inquiry.

B.    Evidentiary Challenges

Rommy submits that a number of erroneous evidentiary rulings require reversal of his conviction. Specifically, he asserts that (1) the district court erred in failing to suppress the five telephone calls recorded in New York and the videotape of the meeting in Bermuda as fruits of DEA violations of the Mutual Legal Assistance Treaty ("MLAT") in effect between the United States and the Netherlands; (2) his post-indictment statements to DEA agents while incarcerated in a Madrid prison should have been suppressed for failure to secure waivers of his Fifth and Sixth Amendment rights; and (3) by allowing the prosecution to read into evidence the transcript of a telephone conversation recorded in 2000 by Dutch authorities, the district court violated Fed. R. Evid. 803(5) and 901(a), as well the Due Process and Confrontation Clauses of the Constitution. None of these arguments warrants reversal.

1.    The MLAT Challenge to the Admission of Recorded Evidence

Rommy contends that the DEA violated the MLAT in effect between the United States and the Netherlands, as well as Dutch domestic law, by employing a confidential

informant (DeVries) to gather evidence in the Netherlands after Dutch officials had denied the United States' MLAT request to conduct an undercover investigation in their country. Rommy submits that the treaty violation required the district court to suppress all evidence obtained from DeVries's use as an informant in the Netherlands and all fruits derived therefrom, specifically, the five telephone calls with Rommy in the Netherlands that were, in fact, recorded in New York, and the videotaped meeting between Rommy, DeVries, and Agent Grey in Bermuda.

On review of a district court's ruling on a motion to suppress evidence, we examine findings of fact for clear error, viewing the evidence in the light most favorable to the government, and we apply de novo review to the district court's conclusions of law. See United States v. Rodriguez, 356 F.3d 254, 257 (2d Cir. 2004); United States v. Casado, 303 F.3d 440, 443 (2d Cir. 2002). Following these principles, we conclude that Rommy's treaty argument fails for two reasons.

First, Rommy cannot demonstrate a treaty violation. The Treaty on Mutual Assistance in Criminal Matters between the United States and the Netherlands, a self-executing agreement that entered into force in this country on September 15, 1983, see Treaty on Mutual Assistance in Criminal Matters, June 12, 1981, U.S.-Neth., 35 U.S.T. 1361, T.I.A.S. No. 10,734, provides various means for the governments of the two countries to provide legal assistance to one another in criminal matters, see id. art. 1 (describing type of assistance

available); see also id. arts. 13-16 (outlining procedures for making and responding to requests for assistance). It also places certain limitations on how information obtained pursuant thereto may be used. See id. art. 11. By its express terms, however, the treaty has no application to evidence obtained outside the MLAT process. Article 18, subsection 1, states:

> Assistance and procedures provided by this Treaty shall be without prejudice to, and shall not prevent or restrict, any assistance or procedure available under other international conventions or arrangements or under the domestic laws of the Contracting Parties.

Id. art. 18, subsec. 1. This does not mean that United States or Dutch authorities, operating without MLAT authorization, may act with impunity in conducting law enforcement investigations in each others' countries. To the contrary, it means that, when securing evidence without MLAT authorization, foreign government officials lacking diplomatic immunity must conduct themselves in accordance with applicable "domestic laws." Id.

Thus, when DEA agents proceeded to use DeVries as a confidential informant in the Netherlands even after their MLAT request to do so was denied, they did not violate the treaty. They did, however, subject themselves and their informant to any constraints imposed on private actors by Dutch law. We need not here decide whether any DEA actions violated Dutch domestic law.[13] The admissibility of evidence in a United States court depends solely

_____

[13] Although DeVries supplied the DEA with information obtained in the course of his undercover dealings with Rommy, it does not appear that the DEA recorded any

41

on compliance with United States law. See United States v. Morrison, 153 F.3d 34, 57 (2d Cir. 1998) (observing that "federal law governs the admissibility of evidence in a federal criminal trial"); United States v. Brown, 52 F.3d 415, 420 (2d Cir. 1995) (noting that "federal law is applicable in a federal prosecution even when state police officers [are] involved" in investigating case); United States v. Pforzheimer, 826 F.2d 200, 203 (2d Cir. 1987) (stating that "federal law governs federal prosecutions in federal court" (internal quotation marks omitted)); cf. United States v. Alvarez-Machain, 504 U.S. 655, 670 (1992) (holding that defendant's forcible abduction from Mexico, authorized by DEA officials, did not prohibit trial in United States for violations of United States criminal laws). Rommy makes no claim on appeal that the DEA's undercover investigation generally, or its recording of the telephone calls in the United States or the meeting in Bermuda specifically, violated any United States law.

A second reason Rommy's MLAT argument fails is that he cannot demonstrate that the treaty creates any judicially enforceable individual right that could be implicated by the government's conduct here. As the Supreme Court has long observed, absent explicit treaty language conferring individual enforcement rights, treaty violations are generally addressed

conversations or conducted any wiretaps in the Netherlands, as proposed in the original MLAT request. Indeed, nothing in the record indicates that Dutch authorities think that their law was violated in this case. A contrary inference might be drawn from the fact that the Netherlands granted the United States' second MLAT request, sharing its own evidence against Rommy for use in the Southern District prosecution.

42

by the signatory sovereigns through diplomatic channels.  See Head Money Cases, 112 U.S.

580, 598 (1884) (noting that "treaty is primarily a compact between independent nations" and

"depends for the enforcement of its provisions on the interest and the honor of the

governments which are parties to it").  For any number of reasons, sovereigns may elect to

overlook non-compliance with particular treaty requirements in given cases.  Thus, a proper

respect for the diplomatic choices of sovereign nations prompts courts generally to apply "a

strong presumption against inferring individual rights from international treaties."  United

States v. De La Pava, 268 F.3d 157, 164 (2d Cir. 2001).

In United States v. Davis, 767 F.2d 1025 (2d Cir. 1985), we were required to consider

a similar use-limitation provision in an MLAT between the United States and Switzerland.

We concluded that the "clear and unambiguous language" reflected the intention of the

signatory states that the Treaty "would not — except in certain specifically designated

circumstances — confer judicially enforceable rights on individuals," and that any potential

exceptions were "not implicated" in Davis's case.  Id. at 1030.  Accordingly, we rejected his

claim that evidence allegedly obtained in violation of that treaty should be excluded.[14]

---

[14] The Davis panel referred to the question as one of "standing."  Id.  We think that
the use of the term was analytically incorrect.  Neither Rommy nor Davis failed to allege,
e.g., a "direct injury" as the constitutional standing doctrine requires.  See, e.g., City of Los
Angeles v. Lyons, 461 U.S. 95, 101-02 (1983).  Nor does it make sense in this context to
discuss the Supreme Court's "prudential" standing doctrine, which may prevent parties from
asserting 1) the rights of someone not before the court, 2) generalized grievances, or 3) rights
outside the "zone of interests" protected by a given statutory or constitutional provision.  See,

Here, the signatories' intent not to create judicially enforceable individual rights is equally clear. Article 18, subsection 2, of the MLAT states:

> Except where this Treaty specifically sets forth rules for the admissibility of evidence, the provisions of this Treaty shall not give rise to a right on the part of any person to take any action in a criminal proceeding to suppress or exclude any evidence. This Treaty does not expand or limit rights to judicial review otherwise available under domestic law.

MLAT, art. 18, subsec. 2.

Rommy argues that Article 11, subsection 2, of the treaty "specifically" addresses "the admissibility of evidence," and therefore provides an exception to this general bar to the creation of individual rights. That provision states:

> The Requesting State shall not use any evidence obtained under this Treaty, nor any information derived therefrom, for purposes other than those stated in the request, without the prior consent of the Requested State.

Id., art. 11, subsec. 2.

Assuming arguendo that this language does create a judicially enforceable individual right, i.e., that a criminal defendant could object in court to the use of certain evidence "for purposes other than those stated in the request," id., the provision is of no help to Rommy. The evidence Rommy seeks to exclude — the five telephone calls with Rommy in the Netherlands (recorded in New York) and the recording of the meeting in Bermuda — were obtained after a request from the United States to make such recordings was refused.

---

e.g., Warth v. Seldin, 422 U.S. 490, 499 (1975).

Accordingly, we have no difficulty concluding that this evidence was not "obtained under" the MLAT and is, therefore, not subject to the strictures of Article 11. Id. Because the challenged recordings were not obtained pursuant to treaty and nothing in Article 11, subsection 2, purports to regulate the admissibility of evidence obtained outside the treaty process, the propriety of suppressing any such evidence is governed solely by United States domestic law. See generally Sanchez-Llamas v. Oregon, 126 S. Ct. 2669, 2678-82 (2006) (observing that exclusionary rule "is an entirely American legal creation" and that application of rule is governed by United States domestic law).

Because Rommy's MLAT-based argument for suppression of evidence thus lacks any foundation in the text of the treaty, we conclude that it was properly denied.

### 2. The Constitutional Challenges to the Madrid Prison Statements

Unrefuted record evidence demonstrates (1) that Rommy himself requested a meeting with DEA agents at the Madrid prison where he was incarcerated pending extradition to the United States; (2) that Rommy's avowed purpose was to persuade the agents that he could provide extensive information on large-scale drug traffickers; (3) that, in the course of the meeting, Rommy in fact volunteered incriminating information about himself[15] and more than a dozen other traffickers, none of whom were known to the agents in attendance; and

---

[15] While Rommy admitted drug trafficking in Europe, he was careful to insist that he had never transported drugs to the United States, despite the purported importuning of various persons, including DeVries.

45

(4) that Rommy arranged for his girlfriend, but not his lawyers, to attend the meeting. Rommy nevertheless contends that, because the agents posed questions at the meeting, his statements were inadmissible at trial without a waiver of his Fifth Amendment Miranda rights and his Sixth Amendment right to counsel.

At the outset, we observe that neither in the district court nor on this appeal do the parties dispute the applicability of Fifth and Sixth Amendment protections to the custodial interrogation of a foreign national outside the United States by agents of this country engaged in a criminal investigation. See generally United States v. Bin Laden, 132 F. Supp. 2d 168, 185-89 (S.D.N.Y. 2001) (positing right to Miranda warnings in that context). The only issues presented for our review are whether the agents' actions at the Madrid prison meeting constituted interrogation for purposes of the Fifth Amendment or the deliberate elicitation of incriminating statements for purposes of the Sixth Amendment.

On review of a motion to suppress evidence, we examine the record in the light most favorable to the government, see United States v. Oates, 560 F.2d 45, 49 (2d Cir. 1977), reviewing the district court's factual findings for clear error and its legal conclusions de novo, see United States v. Rodriguez, 356 F.3d at 257-58; United States v. Garcia, 339 F.3d 116, 118-19 (2d Cir. 2003).

a.      Fifth Amendment Claim

Rommy's Fifth Amendment claim is based solely on his failure to be advised of and to waive the rights identified in Miranda v. Arizona, 384 U.S. at 479; accord Dickerson v. United States, 530 U.S. 428, 443-44 (2000) (reaffirming Miranda).  He does not claim that his statements were otherwise coerced.

Because Miranda warnings are intended "to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights," Moran v. Burbine, 475 U.S. 412, 425 (1986), it naturally follows that Miranda's warning and waiver requirements apply only in the context of "custodial interrogation," i.e., a person must have been both in custody and subjected to interrogation for statements made without warnings or waiver to be inadmissible in the government's case in chief.  Miranda v. Arizona, 384 U.S. at 444; accord United States v. Newton, 369 F.3d 659, 669 (2d Cir. 2004).  Miranda defined "interrogation" as "questioning initiated by law enforcement officers."  384 U.S. at 444.  The Supreme Court later refined this definition to include "not only . . . express questioning, but also . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnotes omitted); see id. at 300-01 (defining interrogation as "either express questioning or its functional equivalent"); accord Rosa v. McCray, 396 F.3d 210, 220-21 (2d Cir. 2005);

47

United States v. Carmona, 873 F.2d 569, 573 (2d Cir. 1989). Because the underlying purpose of the Miranda rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses "primarily upon the perceptions of the suspect, rather than the intent of the police." Rhode Island v. Innis, 446 U.S. at 301; see Wayne R. LaFave et al., 2 Criminal Procedure § 6.7(a), at 543 (2d ed. 1999) (contrasting Miranda's focus on perception of suspect in determining whether incriminating statements are product of interrogation with Sixth Amendment's focus on intent of police in deciding whether statements were deliberately elicited in violation of right to counsel).

As Miranda itself recognized, however, "[v]olunteered statements of any kind are not barred by the Fifth Amendment" and, thus, do not require preliminary advice of rights. Miranda v. Arizona, 384 U.S. at 478 ("There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make." (footnote omitted)); accord Rhode Island v. Innis, 446 U.S. at 300. In Edwards v. Arizona, the Supreme Court explained that, even if a defendant has asserted his Fifth Amendment right to counsel, if the defendant "himself initiates further communication" with law enforcement, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." 451 U.S. 477, 485 (1981).

48

Edwards cautioned, however, that

> [i]f, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of [the defendant's Fifth Amendment rights] had occurred . . . .

Id. at 486 n.9. Rommy asserts that his case fits this scenario. While he concedes that he initiated the meeting with DEA agents at which the challenged statements were made, he submits that because the conversation was "not wholly one-sided," it must be viewed as interrogation requiring advice of rights. Id.

In fact, Edwards draws no bright line requiring a finding of custodial interrogation in every case in which a law enforcement officer interrupts a defendant's volunteered narrative to ask a question. As a leading commentator has observed, "Miranda covers only police conduct likely to be coercive . . . which cannot be said of a question that does nothing more than seek clarification of what the defendant has already volunteered." LaFave et al., 2 Criminal Procedure § 6.7(d), at 567. This comports with the Supreme Court's instruction that "[f]idelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). A number of our sister circuits have concluded that Miranda concerns are not implicated in follow-up questions to volunteered statements. See United States v. Koontz, 143 F.3d 408, 411 (8th Cir. 1998)

49

(holding "statements made in response to a law enforcement officer's attempt to seek clarification of a defendant's remarks, during an interview requested by the defendant, are not the products of interrogation" (internal quotation marks omitted)); United States v. Gonzales, 121 F.3d 928, 940 (5th Cir. 1997) (ruling that "when a suspect spontaneously makes a statement, officers may request clarification" of ambiguities "without running afoul of the Fifth Amendment"); Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir. 1990) (rejecting custodial interrogation challenge when, in response to suspect's volunteered statement, "I stabbed her," police asked, "Who?"); United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985) (holding that no interrogation occurred where, in response to suspect's volunteered statement, "You can't take that," police inquired, "why," and suspect replied, "I can't run my business without that"). But see United States v. Crowder, 62 F.3d 782, 785-86 (6th Cir. 1995) (holding that police officer interrogated suspect when, after suspect stated that shotgun was "in the wood," officer asked clarifying question about location).

We do not — indeed, without review of a full record, we cannot — here decide whether we would reach the same conclusion as our sister circuits in each of these cases. We note simply our agreement with the general principle recognized therein: where a person in custody volunteers incriminating information to the police, simple clarifying questions do not necessarily constitute interrogation. In so holding, we recognize that follow-up questions can take a variety of forms. Careful inquiry into the underlying facts and circumstances may thus

50

be necessary to determine whether a suspect in a particular case would have reasonably understood that the follow-up questions were seeking only to clarify information already volunteered rather than to compel further incriminatory disclosures. In this respect, absent extraordinary circumstances, a court may generally conclude that follow-up questions asking only for volunteered information to be repeated or spelled do not constitute interrogation. The same conclusion might also easily apply to discrete questions seeking confirmation of what appears implicit in the volunteered disclosure.[16] But where questions seek to "expand the scope" of volunteered statements, a more searching inquiry may be necessary to determine whether they have moved beyond neutral clarification to interrogation. LaFave et al., 2 Criminal Procedure § 6.7(d), at 566-67 (suggesting that defendant's statement given after follow-up questions is appropriately deemed "volunteered only if the questions are neutral efforts to clarify what has already been said rather than apparent attempts to expand the scope of the statement previously made").

This case, however, presents us with no such concerns. Although Rommy claimed that the agents asked more than follow-up questions at the Madrid meeting, nothing in the record indicates clear error in the district court's contrary conclusion.[17] As the district court

---

[16] For example, when a volunteered statement, "I bought the drugs on March 15," prompts an agent to ask, "Of this year?" the exchange is unlikely to constitute interrogation even if the defendant responds to the former inquiry by saying, "No, 2006."

[17] Although Rommy faults the district court for failing to conduct an evidentiary hearing on the scope of the agents' questions, defense counsel explored the issue on cross-

expressly found, Rommy not only "voluntarily initiated the meeting with the DEA agents," he "chose the subjects" discussed. United States v. Rommy, No. 02 Cr. 994 (JSR), 2005 WL 1941625, at *2 (S.D.N.Y. July 28, 2005). Agent Fernandez testified without contradiction at trial that, because he knew nothing about Rommy's drug activities or the activities of the persons named, the Madrid meeting was basically a narrative by Rommy,[18] punctuated only by questions to clarify the spellings or dates of information being volunteered and, on one occasion, to understand a drug abbreviation. On de novo review of Rommy's legal challenge, we conclude that such questions did not transform the meeting into an interrogation requiring the advice or waiver of Miranda rights. Nothing in the record supports a conclusion that Rommy could have perceived the agents to be seeking incriminating information beyond what he had already volunteered. See Rhode Island v. Innis, 446 U.S. at 301.

In an effort to avoid this conclusion, Rommy asserts that Agent Fernandez's statement about leniency converted the prison meeting into an interrogation. In support, he cites United States v. Montana, in which this court held that a federal agent's "unsolicited statement

---

examination of Agent Fernandez at trial and developed no evidence at odds with the district court's pre-trial findings. In any event, as we note infra at **[58-59]**, even if Rommy could persuade us that his Madrid prison statement should have been suppressed, the admission of this evidence was plainly harmless in light of other overwhelming evidence of guilt.

[18] Rommy's natural loquaciousness in touting his drug experience and familiarity with large-scale traffickers was apparent on the videotape of the Bermuda undercover meeting.

informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constituted interrogation." 958 F.2d 516, 518 (2d Cir. 1992) (internal quotation marks omitted). This case is plainly distinguishable from Montana. Most obviously, Agent Fernandez's statement about leniency was not "unsolicited," but a direct response to Rommy's assertion that his purpose in asking for a meeting with DEA agents was to obtain leniency. In United States v. Miller, we held that an agent's statement to a defendant that he "could help himself by cooperating did not constitute interrogation since it was not unsolicited but was made in response to [defendant's] own question as to what penalties he faced." 116 F.3d 641, 680 (2d Cir. 1997). In fact, this case raises even fewer concerns than Miller because Agent Fernandez did not suggest to Rommy that he "could help himself by cooperating" with the DEA. Id. Quite the contrary, the agent warned Rommy that cooperation might not result in his obtaining the desired leniency, whereupon the agent even offered to terminate the meeting. Under these circumstances, Rommy cannot claim that his decision to proceed with the meeting and to volunteer extensive statements was the product of interrogation.

Accordingly, we conclude that the district court properly refused to suppress Rommy's Madrid statements on Fifth Amendment grounds.

b.    Sixth Amendment Claim

Rommy submits in the alternative that suppression of the Madrid statements was required because they were made after he had been indicted in the United States and without a knowing and intelligent waiver of his Sixth Amendment right to counsel.

The Sixth Amendment states, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right attaches at the "initiation of adversary judicial proceedings," such as arraignment or the filing of an indictment, United States v. Gouveia, 467 U.S. 180, 188 (1984); United States v. Yousef, 327 F.3d 56, 140 (2d Cir. 2003), and extends to all "critical stages" of a criminal prosecution, including post-indictment interviews with law enforcement authorities, Michigan v. Jackson, 475 U.S. 625, 630 (1986); see Patterson v. Illinois, 487 U.S. 285, 290 (1988); Maine v. Moulton, 474 U.S. 159, 170 (1985). Once the right attaches, "the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel." Michigan v. Harvey, 494 U.S. 344, 348 (1990) (internal quotation marks omitted); accord Massiah v. United States, 377 U.S. 201, 206 (1964); United States v. Edwards, 342 F.3d 168, 182 (2d Cir. 2003). In contrast to the Fifth Amendment's interrogation inquiry, which focuses "primarily upon the perceptions of the suspect," Rhode Island v. Innis, 446 U.S. at 301, deliberate elicitation under the Sixth Amendment "covers only those statements

54

obtained as a result of an <u>intentional</u> effort" on the part of government officials to secure incriminating statements from the accused, <u>United States v. Stevens</u>, 83 F.3d 60, 64 (2d Cir. 1996) (emphasis added); <u>see also</u> <u>Fellers v. United States</u>, 540 U.S. 519, 524 (2004) (noting that Sixth Amendment deliberate elicitation standard is "expressly distinguished" from Fifth Amendment's custodial interrogation standard); LaFave et al., 2 <u>Criminal Procedure</u> § 6.7(a), at 543.

Rommy submits that, absent an explicit waiver of the right to counsel,[19] the Sixth Amendment, in fact, erects a higher bar to the admission of uncounseled statements than the Fifth Amendment. While acknowledging that "nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney," <u>Michigan v. Harvey</u>, 494 U.S. at 352; <u>see</u> <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986), Rommy points to language from various Supreme Court cases in urging a conclusion that <u>any</u> government action beyond merely listening to the defendant requires an express waiver of the right to counsel. <u>See</u> <u>United States v. Henry</u>, 447 U.S. 264, 271-73 (1980) (holding that, even though prison informant had not actually questioned the defendant, he was not simply "a passive listener" but had "stimulated" conversations amounting to deliberate elicitation); <u>cf.</u> <u>Kuhlmann v.</u>

---

[19] Because the district court concluded that Rommy's statements were volunteered, it appears not to have made a specific ruling as to waiver of Sixth Amendment rights.

55

Wilson, 477 U.S. at 459 (holding that, to pursue Sixth Amendment claim, "defendant must demonstrate that the [government] took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"); United States v. Edwards, 342 F.3d at 182 (observing that, if "defendant proceeds to make incriminating statements 'without any prompting or questioning by [government] officers,' his Sixth Amendment rights are not violated even if he had previously requested counsel" (alteration in original) (quoting United States v. Stevens, 83 F.3d at 64 (2d Cir. 1996))).

Because the concerns animating the Sixth Amendment right to counsel differ from those animating the Fifth Amendment's prohibition on compelled incrimination, the Supreme Court has itself differentiated the deliberate elicitation inquiry from the custodial interrogation inquiry. See Fellers v. United States, 540 U.S. at 524. Compare United States v. Wade, 388 U.S. 218, 226 (1967) (observing that Sixth Amendment right to counsel "guarantee[s] that [the accused] need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial"), with Moran v. Burbine, 475 U.S. at 425 (explaining that purpose of Miranda warnings "is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights"). Understanding these different concerns proves most important in dealing with classic situations where the Sixth, but not the Fifth, Amendment protections apply, e.g.,

56

where police engage a person not in custody whose Sixth Amendment right to counsel has attached, or where a prison informant somehow importunes a defendant to make incriminating statements. See generally Kuhlmann v. Wilson, 477 U.S. at 459 (noting that "primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation"). It is less obvious why the two standards should yield different results in this case where an indicted defendant, participating in a meeting that he had requested with persons he knew were law enforcement officers, was asked a few neutral follow-up questions in the course of a lengthy volunteered statement.

We recognize that when an agent, listening to a defendant's volunteered statement, asks him to spell a name, clarify a date, or explain an abbreviation, he does more than merely listen to what the defendant is saying. See id. at 459; cf. United States v. Henry, 447 U.S. at 271 n.9 (observing that electronic recording device poses no deliberate elicitation concern because it "has no capability of leading the conversation into any particular subject or prompting any particular replies"). But it is far from clear that such limited follow-up questions could be found to "stimulate" discussion, to "lead[] the conversation into any particular subject," or to "prompt[] any particular replies" beyond what Rommy himself had volunteered. United States v. Henry, 447 U.S. at 271 n.9.

We need not decide whether the DEA's follow-up questioning constituted deliberate elicitation, however, because even if that questioning rendered Rommy's volunteered prison statement inadmissible under the Sixth Amendment, the error would certainly be plainly harmless in light of other overwhelming evidence of guilt. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003) ("A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (internal quotation marks omitted)); see United States v. Dhinsa, 243 F.3d 635, 649-50 (2d Cir. 2001) (collecting cases discussing harmless error in light of erroneous admission of evidence).

To the extent Rommy's Madrid prison statement acknowledged his own history of drug trafficking in Europe and similar criminal activity by Bosch, Rinaldi, Zuchetto, Allen, and DeVries, among numerous others, the statement corroborated similar testimony by Bosch and Rinaldi, which, in turn, may have lent credibility to their account of Rommy's interest in smuggling ecstasy into New York. But, wholly apart from this co-conspirator testimony, the charged conspiracy was overwhelmingly established by Rommy's own words, recorded on five telephone conversations and at a meeting in Bermuda. On these recordings, the jury heard Rommy actively and explicitly negotiating the shipment of 300,000 ecstasy pills from Europe to New York. Further, on these recordings, particularly the Bermuda videotape,

58

Rommy acknowledged that he had confederates in place in New York ready to take possession and dispose of the pills upon their arrival in the United States.

On such a record, we can confidently conclude that any error in the admission of the Madrid prison statements was harmless beyond a reasonable doubt.

### 3. Challenges to the Dutch Wiretap Transcript

Rommy asserts that the district court erred in allowing the prosecution to read into evidence the transcript of an October 30, 2000 telephone call originally recorded by Dutch authorities in which an unidentified person informs Rommy that another unnamed individual has only 6,000 "Versace t-shirts" remaining. The government argued to the jury that this evidence corroborated Bosch's background testimony that, at Rommy's behest, he had transported a shipment of ecstasy pills stamped with the Versace logo to Switzerland. Apparently, the prosecution proffered the transcript rather than the recording itself because Dutch authorities declined to provide the latter in light of the fact that, under Dutch law, the recording should have been destroyed some time earlier. Rommy contends that the transcript's admission did not comport with Fed. R. Evid. 803(5) (providing hearsay exception for past recollection recorded), Fed. R. Evid. 901 (providing for evidence authentication), or the Due Process and Confrontation Clauses of the Constitution.

We review a district court's evidentiary rulings deferentially for abuse of discretion, see United States v. Dupre, 462 F.3d 131, 136 (2d Cir. 2006); United States v. Paulino, 445 F.3d 211, 217 (2d Cir. 2006), and identify none in this case.

a.     Authentication Challenge — Fed. R. Evid. 901

To lay a proper foundation for the admission of a transcript into evidence, the government must "produce clear and convincing evidence of authenticity and accuracy." United States v. Hamilton, 334 F.3d 170, 186 (2d Cir. 2003) (internal quotation marks omitted); see United States v. Anderson, 452 F.3d 66, 77 (1st Cir. 2006) (observing that "when transcripts are offered for use, either as evidence or a jury aid, they should be authenticated in the same manner as tape recordings that are offered in evidence" (internal quotation marks omitted)). Under Rule 901 of the Federal Rules of Evidence, authentication is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Illustrative examples of such evidence include the testimony of a "witness with knowledge" that "a matter is what it is claimed to be," id. 901(b)(1), or testimony "describing a process or system used to produce a result and showing that the process or system produces an accurate result," id. 901(b)(9). Where evidence includes a voice identification, authentication may be satisfied "by opinion [testimony] based upon hearing the voice at any time under circumstances connecting it with the alleged

speaker." Id. 901(b)(5); see United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001);

United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990).

In this case, the district court acted well within its discretion in finding the challenged transcript adequately authenticated by prosecution witness Antoinette Leichel, a Dutch detective sergeant personally involved in the wiretap investigation from which the transcript derived. Although Det. Leichel had no specific present recollection of the October 30, 2000 call or of preparing the corresponding transcript, she testified that it had been her general practice upon listening to calls intercepted during the investigation to prepare a contemporaneous transcript. This testimony, together with the Dutch production of the transcript in response to the United States' second MLAT request, demonstrated a sufficiently reliable process to authenticate the transcript as a product of the Dutch wiretap investigation.

Insofar as Rommy challenges the authentication of his voice, Det. Leichel testified that Rommy was not originally a subject of the wiretap investigation. Nevertheless, when his voice was identified by a fellow officer familiar with it from another investigation, that served as the basis for her initial identification on the transcripts. About a month after the October 30, 2000 intercept, however, Det. Leichel spoke directly with Rommy at the time of his arrest and personally recognized his voice as the one she had heard on the recorded telephone calls and identified as his on the transcripts. Although Rommy complains that Det.

61

Leichel lacked personal knowledge of Rommy's voice at the time she made an initial attribution with respect to the October 30 call, Rule 901 expressly states that voice identification can be authenticated based upon "hearing the voice at any time." Fed. R. Evid. 901(b)(5) (emphasis added).

b.  Hearsay Challenge — Rule 803(5)

Rommy submits that the district court erred in receiving the transcript into evidence as Det. Leichel's recorded past recollection of what she had heard on the intercepted telephone call. Fed. R. Evid. 803(5) recognizes as a hearsay exception

> [a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly.

For a statement to come within this rule, a proponent must show that (1) the witness's memory of the events detailed in the record was sufficiently impaired; (2) the witness prepared or adopted the record at or near the time of the events reported; and (3) at that time, the record correctly reflected the witness's knowledge of the reported events. See Parker v. Reda, 327 F.3d 211, 213 (2d Cir. 2003).

Det. Leichel's testimony satisfied all three requirements in establishing the transcript as a record of the words she heard when she listened to the intercepted October 30 conversation. To the extent Rommy reiterates his complaint that Det. Leichel had no

62

personal knowledge of his voice at the time she prepared the transcript, his challenge fails. Any error in the admission of the attribution was harmless in light of Det. Leichel's testimony at trial regarding her present recollection of hearing Rommy's voice at the time of his arrest, and her conclusion that it was the same as the one she had understood to be his on the wire intercepts.[20]

### c. Due Process Challenge

Rommy contends that admission of the transcript without the underlying tape recording violated his due process right to a fair trial because he was thus precluded from preparing a competing transcript or proving that the voice on the call was not his.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). In this case, Rommy had ample opportunity at trial to alert the jury to the unavailability of the actual recording and to challenge the reliability of the transcript. Further, cross-examination afforded Rommy the opportunity to challenge Det. Leichel's present voice identification by highlighting her inability to recall either the October 30 intercept or the preparation of the transcript, as well as her lack of personal familiarity with Rommy's voice at the time of the alleged recording and transcript

---

[20] Det. Leichel's identification of Rommy's voice provided an adequate foundation for the district court to admit the substance of his recorded statements for their truth as party admissions. See Fed. R. Evid. 801(d)(2). Rommy raises no hearsay challenge to this ruling.

63

preparation. Under these circumstances, we conclude that the unavailability of the original recording did not deprive Rommy of due process. See United States v. Maxwell, 383 F.2d 437, 441-43 (2d Cir. 1967) (rejecting due process challenge to admission of transcript where underlying recording had been accidentally erased and transcript preparer testified as to accuracy); see also United States v. Ross, 33 F.3d 1507, 1514 n.10 (11th Cir. 1994) (concluding, in case in which original recordings were destroyed by Spanish authorities, that due process challenge to transcripts was without merit "in light of [defendant's] ability to cross-examine the government witnesses" who had prepared transcripts).[21]

### d. Confrontation Clause

Rommy finally claims that the identification of his voice on the transcript violated his Sixth Amendment right to confrontation because that identification derived from the hearsay statement of a Dutch police colleague of Det. Leichel's who did not testify at trial. As we have already observed, the government did not rely on the transcript to identify Rommy's voice; it relied on Det. Leichel's trial testimony. In any event, Rommy's confrontation challenge is meritless.

---

[21] Insofar as Rommy cites cases noting that tape recordings, not transcripts, are the best evidence of a recorded conversation, these cases reach that conclusion in circumstances where the recording is available for trial, which, as the district court expressly found, is not this case.

The Sixth Amendment guarantees an accused the right "to be confronted with the witnesses against him" in all criminal prosecutions. U.S. Const. amend VI. In Rommy's case, the prosecution never attempted to use Leichel's colleague as an absent "witness" against Rommy. Rather, the existence of this colleague was elicited on cross-examination by the defense. The defense purpose was not to prove the truth of the colleague's identification but to suggest the unreliability of Leichel's own claim that she made an independent identification of Rommy's voice after speaking with him at his arrest. Cf. United States v. Crawford, 541 U.S. 36, 59, n.9 (2004) (noting that Confrontation Clause does not bar even the government from using testimonial statements "for purposes other than establishing the truth of the matter asserted").

In sum, we conclude that none of Rommy's challenges to the district court's admission of the October 30 transcript has merit.

### III.  Conclusion

To summarize, we conclude that:

(1) the district court (a) properly instructed that venue must be proved by a preponderance of the evidence, rather than beyond a reasonable doubt; (b) correctly charged that a call placed by a government actor in Manhattan to the defendant in Amsterdam could establish venue in the Southern District of New York, provided the defendant used the call

to further the charged conspiracy; (c) committed no violation of Fed. R. Crim. P. 30; and (d) properly declined to charge manufactured venue in response to the jury's venue inquiry;

(2) the district court correctly refused to suppress recorded evidence as fruits of alleged DEA violations of the MLAT in effect between the United States and the Netherlands;

(3) defendant's Fifth and Sixth Amendment challenges to statements made to DEA agents at a defense-initiated prison meeting in Madrid are without merit or harmless; and

(4) the district court's receipt into evidence of a telephone transcript prepared by Dutch authorities did not violate the Federal Rules of Evidence, or the Due Process or Confrontation Clauses of the Constitution.

AFFIRMED.